**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WESTFIELD INSURANCE COMPANY, | : | No. 4:15-cv-00539 |
| | : | |
| | : | (Judge Brann) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ICON LEGACY CUSTOM MODULAR HOMES AND ICON LEGACY, | : | |
| | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

**May 12, 2017**

The instant motion to compel requires me to determine whether, and to what extent, extrinsic evidence is discoverable in a declaratory insurance coverage action where bad faith is no longer at issue. At first blush, any learned practitioner would expect the proper resolution to flow naturally from rote application of settled contract principles. However, intrepid research and argumentation by counsel have plainly refuted that misconception.

The underlying concepts that animate my decision are, of course, decades-old. Yet, precisely how courts should apply them to discovery disputes like this one are far from decided. Moreover, because amended Federal Rule of Civil

Procedure 26(b)(1) prioritizes proportionality, whatever guidance the prevailing *ad hoc* approach once offered likely commands diminished weight today.

I now seek to synthesize existing case law with this renewed focus on proportionality in discovery: I hold that litigants who wish to discover extrinsic evidence in a contract interpretation case must (1) point to specific language in the agreement itself that is genuinely ambiguous or that extrinsic evidence is likely to render genuinely ambiguous; and (2) show that the requested extrinsic evidence is also likely to resolve the ambiguity without imposing unreasonable expense. Because the insured here falls well short of meeting either of these twin aims, the instant motion to compel is denied, and the case must proceed to dispositive motions.

## I.     BACKGROUND

Plaintiff Westfield Insurance Company seeks a declaratory judgment that it need not compensate Defendant Icon Legacy Custom Modular Homes, a homebuilder from Selinsgrove, Snyder County, Pennsylvania to whom it sold a commercial general liability policy. Specifically, Plaintiff contends that it need not compensate the insured for three claims by modular home purchasers that allegedly arose from Defendant's faulty workmanship, because it argues that such conduct does not constitute an insurable "occurrence" under Pennsylvania law.

Initially, Defendant was sued in two separate state court proceedings in New York and Massachusetts, and Plaintiff agreed to defend it as to those actions subject to a reservation of rights. Plaintiff then initiated this action in federal court, seeking a declaration that it owes Defendant no defense or indemnity under the subject policy as to those actions.

When Defendant was sued for a third time, then in Vermont state court, Plaintiff amended its complaint and sought a similar declaration as to the newly filed action. In response, Defendant filed a counterclaim alleging that Plaintiff's decision to deny coverage in that third case was made in bad faith. Plaintiff thereafter filed a motion to dismiss, arguing that Defendant had failed to plausibly plead sufficient facts supporting its bad faith claim.

This Court granted that motion on August 29, 2016, on the basis that Defendant had proffered little in the way of a showing of bad faith. The Court's key observation was as follows:

> Most apparently, even taking for granted the similarity between any set of claims, coverage of some claims and denial of others is not *per se* evidence of *bad faith* insurance practices. For example, consider a hypothetical set of five claims, all of which are "similar" but none of which the insurer believes in good faith it is legally bound to offer coverage. The insurer could, if it wanted, offer coverage in none or all or two or three of those cases. Denial would not be made in *bad faith* under the law. Rather, it would be made based upon a calculated business judgment, risk avoidance, litigation forecasts, etc. The point is that "similarity" among claims is a poor predictor of bad faith denials in cases where either the claims' alleged similarity or the

claims' coverage under the policy is not clearly established. I perceive both of those elements to be lacking here.

Just as importantly, the Court expedited that motion based upon representations by both counsel that its quick disposition would help to resolve this action or at least move it forward.

Shortly thereafter, however, the parties found themselves back on this Court's doorsteps, detailing again that they had reached several discovery impasses. As a result, the Court held a telephonic status conference on November 1, 2016, just two months after it issued its motion to dismiss Memorandum. I issued the following Order after the call that same day:

1. The discovery deadline is extended for a final time to December 30, 2016. No further extensions will be granted.

. . .

4. The Court strongly encourages the parties to independently and efficiently resolve any additional discovery disputes, keeping in mind the discussion that took place on the October 31, 2016 conference call, the Court's August 29, 2016 motion to dismiss memorandum, and Federal Rule of Civil Procedure 26(b)'s proportionality mandate.

Despite the Court's admonitions, counsel, led by a December 28, 2016 letter by defense counsel, returned to the Court yet again, purportedly tangled in a discovery quagmire once more. Following that exchange, this Court granted Defendant leave to file any appropriate motions. I also held a comprehensive oral argument on March 9, 2017, at which time the parties addressed the two motions

that Defendant filed: a motion to compel of dubious timing that largely seeks extrinsic evidence tangential to the declaratory claim; and a motion for sanctions over what might best be described as trivial (and perhaps justified) dust-ups by two otherwise sterling sets of advocates.

Having delved deeply into the underbelly of the beast, I nevertheless remain of the view that "[f]or all of its procedural machinations," this case is "rather straightforward." *Westfield Ins. Co. v. Icon Legacy Custom Modular Homes*, 2016 WL 4502456, at *1 (M.D. Pa. Aug. 29, 2016). As detailed more fully below, Defendant's motion to compel and motion for sanctions are both denied, and the case will now proceed to dispositive motions.

## II.    LAW

"It is well established that the scope and conduct of discovery are within the sound discretion of the trial court . . . and that after final judgment of the district court . . . our review is confined to determining if that discretion has been abused." *Marroquin-Manriquez v. I.N.S.*, 699 F.2d 129, 134 (3d Cir. 1983) (Aldisert, J.). "To find such abuse it is usually necessary to conclude that there has been an interference with a substantial right . . . or that the discovery ruling is seen to be a gross abuse of discretion resulting in fundamental unfairness in the trial of the case." *Id.* Thus, the United States Court of Appeals for the Third Circuit has forewarned litigants that it "will not interfere with a trial court's control of its

docket except upon the clearest showing that the procedures have resulted in actual and substantial prejudice to the complaining litigant." *In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 817–18 (3d Cir. 1982) (Aldisert, J.).

"Discovery need not be perfect, but discovery must be fair." *Boeynaems v. LA Fitness Int'l, LLC*, 285 F.R.D. 331, 333 (E.D. Pa. 2012) (Baylson, J.). "The responses sought must comport with the traditional notions of relevancy and must not impose an undue burden on the responding party." *Hicks v. Arthur*, 159 F.R.D. 468, 470 (E.D. Pa. 1995). "[T]he scope of [ ] discovery is not without limits." *Kresefky v. Panasonic Commc'ns & Sys. Co.*, 169 F.R.D. 54, 64 (D.N.J. 1996). As such, "[d]iscovery should be tailored to the issues involved in the particular case." *Id.* As amended Federal Rule of Civil Procedure 26(b)(1) states:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

"To determine the scope of discoverable information under Rule 26(b)(1), the Court looks initially to the pleadings." *Trask v. Olin Corp.*, 298 F.R.D. 244, 263 (W.D. Pa. 2014) (Fischer, J.). In ascertaining which materials are discoverable and which are not, a district court must further distinguish between requests that

"appear[ ] reasonably calculated to lead to the discovery of admissible evidence," *Bell v. Lockheed Martin Corp.*, 270 F.R.D. 186, 191 (D.N.J. 2010), and demands that are "overly broad and unduly burdensome." *Miller v. Hygrade Food Products Corp.*, 89 F. Supp. 2d 643, 657 (E.D. Pa. 2000).

"[T]he discovery rules are meant to be construed quite liberally so as to permit the discovery of any information which is relevant and is reasonably calculated to lead to the discovery of admissible evidence." *Fid. Fed. Sav. & Loan Ass'n v. Felicetti*, 148 F.R.D. 532, 534 (E.D. Pa. 1993). "As an initial matter, therefore, all relevant material is discoverable unless an applicable evidentiary privilege is asserted. The presumption that such matter is discoverable, however, is defeasible." *Pearson v. Miller*, 211 F.3d 57, 65 (3d Cir. 2000).

Federal Rule of Civil Procedure 37(a)(3)(B) states that "[a] party seeking discovery may move for an order compelling an answer, designation, production, or inspection." "In order to succeed on a motion to compel discovery, a party must first prove that it sought discovery from its opponent." *Petrucelli v. Bohringer & Ratzinger*, 46 F.3d 1298, 1310 (3d Cir. 1995) (Cowen, J.) (citing Fed. R. Civ. P. 37(a)(1)). In addition, "[t]he party seeking the discovery has the burden of clearly showing the relevancy of the information sought." *Caver v. City of Trenton*, 192 F.R.D. 154, 159 (D.N.J. 2000).

## III.  ANALYSIS

Consistent with the following analysis, both motions presently under consideration will be denied.

### A.  Defendant's Motion to Compel is denied.

Generic statements about ambiguity, extrinsic evidence, and four corners litter the applicable case law. However, instructions for mobilizing these concepts are unfortunately far less prevalent. A leading decision by the United States Court of Appeals for the Third Circuit that endeavored to harmonize this area of Pennsylvania contract law is *Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79 (3d Cir. 2001). Chief Judge Edward R. Becker, writing for a unanimous panel in *Bohler-Uddeholm*, graciously described that body of law as "somewhat complicated": "while the broad principles are clear, it is not a seamless web." *Id.* at 92.

The Court of Appeals in *Bohler-Uddeholm* traced the following landscape of the law: the keystone principle of interpretation is that "the intent of the parties to a written contract is contained in the writing itself." *Id.* (quoting *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. Ct. 1993)). Thus, "where language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as *manifestly expressed*, rather than as, perhaps, silently intended."

*Bohler-Uddeholm*, 247 F.3d at 92–93 (quoting *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982)).

However, "where the contract terms are ambiguous and susceptible of more than one reasonable interpretation, however, the court is free to receive extrinsic evidence, *i.e.,* parol evidence, to resolve the ambiguity." *Bohler-Uddeholm*, 247 F.3d at 93 (quoting *Krizovensky*, 624 A.2d at 642). That being said, "because Pennsylvania presumes that the writing conveys the parties' intent," *Bohler-Uddeholm*, 247 F.3d at 93, a contract is ambiguous "if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning." *Id.* (quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir.1995)). *See also Samuel Rappaport Family P'ship v. Meridian Bank*, 657 A.2d 17, 21 (Pa. Super. Ct. 1995).

Pennsylvania law also recognizes two types of ambiguity: "patent" and "latent." *Bohler-Uddeholm*, 247 F.3d at 93. "While a patent ambiguity appears on the face of the instrument, 'a latent ambiguity arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous.'" *Id.* (quoting *Duquesne Light*, 66 F.3d at 614).

Importantly, "[a] party may use extrinsic evidence to support its claim of latent ambiguity, but this evidence must show that some specific term or terms in the contract are ambiguous; it cannot simply show that the parties intended something different that was not incorporated into the contract." *Bohler-Uddeholm*, 247 F.3d at 93. "Lest the ambiguity inquiry degenerate into an impermissible analysis of the parties' subjective intent, such an inquiry appropriately is confined to the parties linguistic reference. . . . The parties' expectations, standing alone, are irrelevant without any *contractual hook* on which to pin them." *Bohler-Uddeholm*, 247 F.3d at 93 (quoting *Duquesne Light*, 66 F.3d at 614 n.9) (internal quotation marks omitted).

"Of course, any use of extrinsic evidence to support an alternative interpretation of facially unambiguous language must be careful not to cross the 'point at which interpretation becomes alteration of the written contract.'" *Bohler-Uddeholm*, 247 F.3d at 94 (quoting at *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir. 1980)). That sentiment reiterated by *Bohler-Uddeholm* is nothing new. In fact, I have previously noted, albeit in the analogous context of natural gas leases, that "[i]nterpretation is not concerned with the parties' post hoc judgments . . . as to what should have been." *Camp Ne'er Too Late, LP v. Swepi, LP*, 185 F. Supp. 3d 517, 544 (M.D. Pa. 2016). Rather, the interpreting court "seeks to be faithful to the meaning that the parties—given their

positions at the time of contracting—would have given their words *ex ante*." *Id.*

The *Bohler-Uddeholm* court thus noted that "a court should determine whether the type of extrinsic evidence offered could be used to support a reasonable alternative interpretation under the precepts of Pennsylvania law on contract interpretation." 247 F.3d at 94. Accordingly, "the key inquiry in this context will likely be whether the proffered extrinsic evidence is about the parties' objectively manifested 'linguistic reference' regarding the terms of the contract, or is instead merely about their expectations." *Id.* n.3. "The former is the right type of extrinsic evidence for establishing latent ambiguity under Pennsylvania law, while the latter is not." *Id.* Consequently, "[e]vidence regarding a party's beliefs about the general ramifications of the contract would not be the right type to establish latent ambiguity." *Id.* Thus, to truly exist, contractual ambiguity must be capable of being divined by a reasonable reader from the plain text of the document itself—courts should prioritize syntax over circumstance.

Critically, I also note that extrinsic evidence may "support an alternative interpretation of a term that sharpens its meaning" but not "an interpretation that completely changes the meaning." *Mericle v. Jackson National Life Insurance Co.*, 193 F. Supp. 3d 435, 449 (M.D. Pa. 2016) (Caputo, J.). For instance, such evidence "may be used to show that 'Ten Dollars paid on January 5, 1980,' meant ten

Canadian dollars, but it would not be allowed to show the parties meant twenty dollars.'" *Id.*

This somewhat drawn-out exegesis leads to the seminal question presented by Defendant's motion to compel: When and to what extent is extrinsic evidence *discoverable* in a straightforward contract interpretation action? Or, approached from a different angle, what must a litigant *show* to justify the burden of requiring such production?

It cannot be that such evidence always may be discovered, with no questions asked. After all, it would be wholly futile for a court to order the production of sweeping discovery that could potentially exert zero impact whatsoever on the ultimate legal issue. That could easily be the case for extrinsic evidence requested in a case where the underlying agreement turns out to be completely unambiguous.

On the other hand, it would likely be judicial overreach to conclude that extrinsic evidence is never discoverable. Some contracts will have legitimately ambiguous lingo, and in those cases, extrinsic evidence may be relevant to the ultimate determination. *See Insurance Adjustment Bureau, Inc. v. Allstate Insurance Co.*, 905 A.2d 462, 468 (Pa. 2006). And in fact, it is well accepted that extrinsic evidence may, in narrow circumstances, even be used to demonstrate the existence of an ambiguity in the first place. *See, e.g.*, *Mericle*, 193 F.Supp.3d at 449 ("Courts may also consider extrinsic evidence of a term's recognized trade

usage, whether or not that term is ambiguous, where the term is used in a commercial contract.") (internal quotation marks omitted).

Thus, one variable upon which my determination would seem to turn is whether a threshold showing of ambiguity has been made. Perhaps more specifically, this means that a movant should be able to point to specific language in the contract that is facially ambiguous or that extrinsic evidence is likely to render genuinely ambiguous. A *genuine* ambiguity is an ambiguity about which reasonable minds could differ. *See Desabato v. Assurance Co. of America*, 213 F. Supp. 3d 735 (W.D. Pa. 2016) ("A provision is ambiguous if, after considering it in the context of the entire policy, reasonable minds could differ as to its meaning.").

Such a showing is not satisfied by bald assertions of ambiguity. As the Plaintiff here properly notes, that low of a threshold would be "untenable," because "any coverage dispute could explode into unlimited discovery solely on an insured's *ipse dixit* assertions of ambiguity." ECF No. 70 at 19. I agree and hold that a movant must make some affirmative showing that the mutual intent of the parties is contrary to the agreement's facial meaning and had previously been objectively expressed through, for example, "evidence of prior agreements and communications of the parties as well as trade usage or course of dealing." *Aleynikov v. Goldman Sachs Group, Inc.*, 765 F.3d 350, 362 (3d Cir. 2014) (Fisher, J.).

Another factor bearing upon the discoverability of extrinsic evidence like underwriting files and training manuals is whether a bad faith claim is still being litigated at the time of the request. The existence of such a claim makes discoverability more likely, yet it by no means guarantees it. *See, e.g.*, *Stephens v. State Farm Fire & Casualty Co.*, 2015 WL 1638516, at *4 (M.D. Pa. Apr. 13, 2015) (Carlson, Mag. J.) (claims manuals, guidelines, instructions, and incentives "may be relevant to a bad faith claim" if "the conduct of the adjuster . . . is squarely at issue"). This follows because "[t]he issue in a bad faith case is whether the insurer acted recklessly or with ill will towards the plaintiff in a particular case, not whether the defendants' business practices were generally reasonable." *Mann v. UNUM Life Insurance Co. of America*, 2003 WL 22917545, at *10 (E.D. Pa. Nov. 25, 2003).

The same level of access to extrinsic evidence is not so obvious for actions that solely seek a declaration regarding the insurer's obligation to defend. In declaratory actions like this one, the language of the agreement controls, as it often will suffice to dictate the proper outcome without reference to any external sources. That is the purpose of a wholly integrated contract after all.

Courts have often relied upon this critical difference between declaratory and bad faith claims (and the distinct types of evidence each requires) when making case management determinations. Indeed, in *Federal Insurance Co. v.*

*Continental Casualty Co.*, the Honorable Terrence F. McVerry, writing for the United States District Court for the Western District of Pennsylvania granted a motion to bifurcate and stay a bad faith claim brought in declaratory action. 2006 WL 1344811, at *1 (W.D. Pa. May 16, 2006). According to Judge McVerry, bifurcation was appropriate because the declaratory claims "are the *only* claims . . . susceptible to judicial resolution as a matter of law and with little or no discovery necessary." *Id.* In granting the motion, Judge McVerry endorsed the insurer's argument that "the evidence needed to resolve the bad faith counterclaim is markedly different from and largely irrelevant to the resolution of the parties' coverage claims." *Id.* (internal quotation marks omitted).

Again, in *AstenJohnson v. Columbia Casualty Co.*, the Honorable Lawrence F. Stengel, writing for the United States District Court for the Eastern District of Pennsylvania, also granted a motion to bifurcate that "would separate the trial for declaratory relief from the trial on the bad faith claim." 2006 WL 1791260, at *1 n.4 (E.D. Pa. June 22, 2006). According to Judge Stengel, bifurcation was warranted, as "any evidence of bad faith at trial for the declaratory judgment has the potential to be highly prejudicial to [co-defendant] American Insurance, who is not facing a bad faith claim." *Id.* at *3.

Once more, the United States District Court for the District of New Jersey granted an insurer's motion to sever and stay a bad faith claim in *Riverview Towers*

*Apartment Corp. v. QBE Insurance Corp.*, 2015 WL 1886007, at *2 (D.N.J. Apr. 17, 2015). The court reasoned that "plaintiff's contract and bad faith claims require the testimony of *different* witnesses and *different* documentary proof." *Id.* at *2 (emphasis added). *See also Daggett v. Am. Sec. Ins. Co.*, 2008 WL 1776576, at *3 (M.D. Fla. Apr. 17, 2008) ("It is certainly true that a claim for a declaratory judgment as to insurance coverage and a claim for bad faith are different."); *Silk, LLC v. Mount Vernon Fire Insurance Co.*, 2011 WL 1886566, at *2 (Conn. Super. Ct. Apr. 20, 2011) ("Clearly, the issues raised in the complaints in the declaratory judgment action and the bad faith actions, while related, are markedly different.").

Other courts have honed in on the practical and legal reasons why extrinsic evidence holds comparably little weight in the declaratory context. *See, e.g.*, *Anderson v. Government Employees Insurance Co.*, 2014 WL 12616960, at *3 (M.D. Fla. May 8, 2014) ("[A]n insurer's claims file is relevant in bad-faith-insurance cases because it presents virtually the only source of direct evidence with regard to the essential issue of the insurance company's handling of the insured's claim.") (internal quotation marks omitted); *American Home Assurance Co. v. Arrow Terminals, Inc.*, 2013 WL 12157428, at *2 (M.D. Fla. Jan. 17, 2013) ("Specifically, in insurance actions where the only claim is one for declaratory relief, discovery of extrinsic evidence is considered irrelevant for the purposes of the action.").

Not to put the summary-judgment cart before the motion-to-compel horse, but the Defendant, in my view, has offered little persuasive argument about ambiguous language in the instant contract. That much was clear during targeted questioning at oral argument:

> THE COURT: Suppose we have a contract that reads as follows: "Damage is covered only if it is caused by an accident." And let's also assume that the word accident could have several meanings. It might mean a mistake. It might mean events that flow from intentional conduct. It might mean even a traffic accident or a construction accident.
>
> The second facet of this example is just as important. And I want you to assume that a body of state law that applies to the interpretation of this agreement has never spoken to or defined the meaning of the term accident. So that would be an ambiguous contract term, right? Well, it reasonably has more than one meaning. A mistake, traffic accident, et cetera, and we have no supporting state law interpretation.
>
> . . .
>
> So what I mean to ask is doesn't the underlying state law make clear that only one version of accident—"accident"—is reasonably applicable here; namely, the version that meets negligent conduct at most?
>
> MR. RUDD: If the policy has not redefined that term, yes.
>
> THE COURT: Next example, same contract. "Damages covered only if it is caused by an accident." The state courts here have also unequivocally spoken as to the meaning of the term accident in contracts that

apply that state's law. Here is how the state supreme court has defined the term accident, though: "Accident is an amorphous term whose occurrence depends upon a number of factors." Then, if the court listed ten different factors that lower courts or federal courts sitting in diversity must apply to determine whether an accident has occurred, is accident ambiguous in that example?

MR. RUDD:     No, I don't think the term accident itself is necessarily ambiguous. How it's applied, it can be implied as you just indicated.

. . .

THE COURT:     All right. Last hypothetical. Again, same language. "Damage is recovered only if it is caused by an accident." This time a state supreme court has held as follows: "Whether an accident has occurred is a determination that rests solely within the discretion of the trial judge." Is the term accident in that contract ambiguous or isn't it?

MR. RUDD:     No, I don't think just because it's the discretion of the judge to decide whether an accident occurs that it means that the term accident itself is ambiguous. It's how it's applied.

Tr. of March 9, 2017 Oral Argument, ECF No. 84, at 92:02–98:09.

To provide some context, the pertinent provisions of the policy at issue are as follows:

This insurance applies to "bodily injury" and "property damage" only if: (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;"

An endorsement also added the following language:

Damages because of "property damage" include damages to the insured becomes legally obligated to pay because of "property damage" to "your work" and shall be deemed to be caused by an "occurrence", but only if:

(1)     The "property damage" is entirely the result of work performed on your behalf by a subcontractor(s) that is not a Named Insured;

(2)     The work performed by the subcontractor(s) is within the "products-completed operations hazard"; and

(3)     The "property damage" is unexpected and unintended from the standpoint of the insured.

By definition, "[w]ork that has not yet been completed or abandoned" is not included within the definition of "products-completed hazard."

Rather than attempt to identify linguistic ambiguities in the above provisions, the Defendant's prime argument here appears to be a legal one centered upon the breadth of the rule set forth in *Kvaerner Metals Division of Kvaerner U.S., Inc. v. Commercial Union Insurance Co.*, 908 A.2d 888, 898 (Pa. 2006). The Supreme Court of Pennsylvania in *Kvaerner* held that the key component in the customary definition of the term "accident" was "unexpected," which "implies a degree of fortuity that is not present in a claim for faulty workmanship." *Id.* at 333.

In essence, the Defendant here leads with the argument that *Kvaerner* "does not apply to every claim arising out of faulty workmanship, since if that was the case, there would be no coverage for bodily injury and death claims arising out of faulty workmanship." ECF No. 62 at 2. Arguments like these going to the ultimate

coverage decision are of tangential relevance to this motion, yet nevertheless comprise the first eight pages of Defendant's opening fifteen-page brief.

As it gets more specific, Defendant somewhat murkily observes that it "is not seeking any extrinsic evidence to try and counter the allegations asserted in the underlying State Court Actions." *Id.* at 8. To the contrary, it writes, "the 'extrinsic' evidence at issue all goes to the interpretation of the Policy language so that [the Defendant] can better present its position on the many unique coverage issues involved in this case and explain the reasons the allegations in the underlying complaints support coverage." *Id.* Nothing about that explanation alters the legal requirement that the moving party show some sort of linguistically-based ambiguity before such evidence may even carry marginal relevance in cases such as this one. As Plaintiff rightly comments:

> With the Policy and Complaints indisputably available, the Court has everything it needs to render its decision as to whether Westfield owes Icon coverage. While Icon spills much ink conveying *its* views of the case law governing coverage, and proffers its own version of the facts germane to this case, the Motion misses the analytical mark.

ECF No. 70 at 14.

Viewed graciously, Defendant hinges its argument on a spattering of district court cases, the main citation appearing to be a decision from 1990 by then United States Magistrate Judge (later District Judge) Freda L. Wolfson of the United States District Court for the District of New Jersey. In *Nestle Foods Corp. v. Aetna*

*Casualty and Surety Co.*, then Magistrate Judge Wolfson identified three potentially ambiguous terms whose definitions had apparently not been supplied by the agreement or by state law. 135 F.R.D. 101, 104. Those definitional terms were: "pollution exclusion"; "sudden occurrence"; and "property damage." *Id.* Further, the operative state law in *Nestle* had not yet been decided, though the court looked primarily to New Jersey law. *Id.* at 105. No party in *Nestle* suggested that Pennsylvania law should apply. *Id.* at 111 ("[Co-defendant] contends that New York law governs."). Thus, *Nestle*—what otherwise would merely be marginally persuasive—is facially distinguishable on two important grounds: (1) the movant in *Nestle* properly identified likely linguistic sources of ambiguity; and (2) Pennsylvania state law was not guiding the discovery determination.

There is, however, a third, lurking procedural reason why *Nestle* is wholly inapplicable here. The discovery dispute in *Nestle* had been assigned to a magistrate judge for the sole purpose of its resolution, meaning that the ultimate determinations as to choice of law, ambiguity, and coverage had been divorced from those relating to that particular discovery dispute. In my view, that is not the most advisable way to proceed in cases like these. Nevertheless, it is undoubtedly different from the manner in which we have proceeded in this case. Here, no discovery disputes have been referred out, and I have maintained a close familiarity with the applicable law and the contours of the policy. In fact,

application of Pennsylvania law to this action was essentially determined at the parties' request in an earlier Memorandum, and the parties have briefed and argued the present issue as if Pennsylvania law applies. *See* ECF No. 46 at 9 ("Considering the facts available to the Court, I now hold that the law of the Commonwealth of Pennsylvania applies to this dispute.").

I am not ignorant of the apparent chicken-or-egg problem that coverage cases present: extrinsic evidence may be used to demystify facially ambiguous language, but in the first place, a determination of ambiguity may depend upon or permit consideration of that very same extrinsic evidence. This puts two sentiments at war: How can an insured be deprived of potentially relevant evidence before it has a chance to prove such evidence's relevance? And, how can insurer be forced to produce a bulk of evidence whose relevance, if any, awaits subsequent determinations?

This may suggest that the most efficient procedural approach is that taken by some of my colleagues cited above, in which the district court severs and stays all claims besides the core declaratory one and essentially expedites a coverage determination. This approach has several advantages. It disposes of the coverage determination first, it may justify termination of coverage previously issued pursuant to a reservation of rights, it eliminates the most straightforward claim for which the least discovery and witnesses (if any at all) are required, and it may also

entirely moot the bad faith claim and any other attendant claims of which wrongful denial is an element.

A different path was followed here, and I must now make an equitable determination somewhere between the poles of insureds never obtaining any discovery of extrinsic evidence when it otherwise may be warranted, and insurers always having to turn over reams of extrinsic evidence that bear unproven relevance. I believe that requiring insureds to (1) point to specific language in the agreement itself that is genuinely ambiguous or that extrinsic evidence is likely to render genuinely ambiguous; and (2) show that the requested extrinsic evidence is also likely to resolve the ambiguity without imposing unreasonable expense, is a reasonable solution to this somewhat perplexing procedural dilemma.

Moreover, it accords with prior determinations that have applied Pennsylvania law to similar requests. A leading decision is *Rhone-Poulenc Rorer Inc. v. Home Indemnity Co.*, 139 F.R.D. 609 (E.D. Pa. 1991). The *Rhone-Poulenc* court denied a request for extrinsic evidence in an insurance coverage dispute, reasoning that "the appropriateness of such discovery should not even be an issue unless and until there has been a finding by the District Court that one or more of the provisions of the policies at issue is ambiguous." *Id.* at 612. To hold otherwise, the court reasoned, would permit "a fishing expedition" for evidence that "lacked sufficient indicia of relevance." *Id.* at 613.

Further, in *Medmarc Casualty Insurance Co. v. Arrow Int'l, Inc.*, the United States District Court for the Eastern District of Pennsylvania rejected another request for extrinsic evidence in a coverage determination case. 2002 WL 1870452 (E.D. Pa. July 29, 2002). Also prioritizing a clear rule, the *Medmarc* court explained that such evidence was not discoverable where the insured "does not allege that the insurance policy at issue is ambiguous" and does not "explain" how the requested discovery "would shed light on the public policy of Pennsylvania as to coverage . . . and how that determination affects the interpretation of the punitive damages provision in question." *Id.* at *5. Any other approach would flout the parties' intent "as it is reasonably manifested by the language of the written contract." *Id.* at *6.

Lastly, I point to the decision of the Honorable Yvette Kane, of this Court, in *Federal Insurance Co. v. Sandusky*—a case involving a coverage dispute stemming from the sexual abuse of children by a former Pennsylvania State University assistant football coach. 2013 WL 785269 (M.D. Pa. Mar. 1, 2013). In *Sandusky*, Judge Kane started with the foundational principle that "[i]n a declaratory judgment action brought to determine an insurer's duty to defend and indemnify, 'the allegations raised in the underlying complaint alone fix the insurer's duty to defend.'" *Id.* at *4 (quoting *Erie Insurance Exchange v. Claypoole,* 673 A.2d 348, 355 (Pa. Super. Ct. 1996)).

Judge Kane went on to deny a discovery request by the defendant, which evidence would purportedly have "show[ed] that Plaintiff intended for the policy to provide defense coverage for litigation including sexual misconduct." *Id.* at *8. According to Judge Kane, such evidence was not discoverable because the underlying policy "clearly and unambiguously limits coverage." *Id.* Because the defendant could "not offer any support" for the ambiguity that he claimed existed, resort to extrinsic evidence was inappropriate. *Id.* at *5 & n.2.

In addition to the above-cited case law, I believe this approach accords with the renewed importance that "proportionality" plays in amended Federal Rule of Civil Procedure 26(b)(1). As amended Rule 26(b)(1)'s proportionality mandate provides:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Thus, it has been said that the amended rule "restores the proportionality factors to their original place in defining the scope of discovery." *Wertz v. GEA Heat Exchangers Inc.*, 2015 WL 8959408, at *2 (M.D. Pa. Dec. 16, 2015) (Mehalchick, Mag. J.). *See also Summy-Long v. Pennsylvania State Univ.*, 2016 WL 74767, at *8 (M.D. Pa. Jan. 7, 2016) (Brann, J.) (quoting Fed. R. Civ. P. 1) ("[I]t is now

unmistakable that the Court and the parties in any federal civil action must constantly strive to resolve unsettled disputes with the ultimate end of a 'just, speedy, and inexpensive determination of every action and proceeding.'");

For instance, applying the proportionality mandate of amended Rule 26(b)(1), I have noted in an analogous context that the Rule contemplates "a sliding scale analysis": demonstrably relevant material "should be discoverable in the greatest quantities and for the most varied purposes"; however, less relevant material "should be incrementally less discoverable—and for more limited purposes," as the relevancy diminishes. *Fassett v. Sears Holdings Corp.*, --- F.R.D. ---, 2017 WL 386646, at *1 (M.D. Pa. Jan. 27, 2017). This approach prevents district courts from "imposing an inordinate and expensive burden" only to obtain discovery materials that are likely to be "marginally relevant at most." *Independent Petrochemical Corp. v. Aetna Casualty & Surety Co.*, 117 F.R.D. 283, 286 (D.D.C. 1986).

In my view, the present motion is also tainted by timeliness concerns, as certain of the requested evidence stems from responses made nearly one year prior to the filing of the motion to compel. Further, the letter by defense counsel that kindled this motion was entered on December 28, just two days before the December 30 discovery deadline. I have previously rejected similar "eleventh-hour" requests to enlarge the scope and timeframe of discovery where prior

extensions have been granted. *See Summy-Long*, 2016 WL 74767, at *1 (denying

"a stale discovery request and produce a host of documents that would enlarge the

temporal scope of this already-prolonged litigation").

Defendant here requests production of a number of documents that are

wholly irrelevant to a straightforward coverage determination, that might only bear

marginal relevance even in a bad faith action, or that are unduly burdensome and

entirely beyond the scope of this litigation. As such, the following document

requests are denied:

| No. | Request |
| --- | --- |
| 3 | underwriting file |
| 6 | communications regarding claims investigations |
| 16 | communications regarding defense decision in *Swaldi* action |
| 17 | communications regarding "each and every legal action that you are currently defending on behalf of a Pennsylvania insured that manufactures a product or performs construction related work" |
| 18 | comparable to #17 |
| 19 | comparable to #17 |
| 29 | "a complete copy of your underwriting file" |
| 30 | *Swaldi* internal claims file |
| 31 | documents setting forth your coverage decisions "in all claims where you have accepted coverage with or without a reservation of rights on behalf of a Pennsylvania insured that manufactures a product or performs construction related work" |

| 32 | "any and all advertising or marketing documents related to the endorsement covering a subcontractor's work" |

| 33 | "any and all claims manuals, bulletins, guidelines, training materials or other similar documents explaining the coverage provided by or the manner in which to handle a claim that involves issues related to the endorsement covering a subcontractor's work" |

Plaintiff indicates that it has complied with Docket Request Nos. 7 (documents relating to the subject matter of this litigation) and 8 (documents relating to the subject matter of the underlying state court actions). It also suggests that it has complied with Interrogatory No. 2 (identification of all persons with knowledge of facts relevant to the issues in this litigation and the underlying state court litigations). I agree that, subject to appropriate reservations based upon valid claims of confidentiality, work product, or other privilege, such information is discoverable and should be produced or appropriately responded to.

On the other hand, given that a declaratory coverage claim is the only remaining claim at issue, the following interrogatories are also irrelevant, overbroad, and need not be answered:

| No. | Interrogatory |

| 4 | "Identify all persons who were assigned by Westfield to manage any policy of insurance existing between Westfield and Icon from January 1, 2010 to the present." |

| 6 | "Identify the business procedure undertaken by Westfield when a policy of insurance is purchased from initial negotiation of policy terms through delivery of the policy to the insured." |

| | |
|---|---|
| 7 | comparable to #6 |
| 14 | "State each and every factual basis for your decision to provide a defense in the action captioned *Swaldi*." |
| 15 | "Identify by caption each and every legal action that you are currently defending on behalf of a Pennsylvania insured that manufactures a product or performs construction related work." |
| 16 | comparable to #15 |
| 17 | comparable to #15 |

**B.    Defendant's Motion for Sanctions is denied.**

Defendant also filed a motion for sanctions for Plaintiff's purported failure to produce certain witnesses on several noticed deposition topics. Rule 37(a), which outlines the requisite procedures for seeking and enforcing a motion to compel, provides, in pertinent part, as follows:

**(a)    Motion for an Order Compelling Disclosure or Discovery.**

(1)    In General. On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery. The motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action.

Its counterpart, Rule 37(b), provides for penalties in the event of noncompliance with an order compelling discovery. In pertinent part, it reads:

**(b)    Failure to Comply with a Court Order.**

. . .

(2)     Sanctions Sought in the District Where the Action Is Pending.

(A)     For Not Obeying a Discovery Order. If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:

(i)     directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii)    prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii)   striking pleadings in whole or in part;

(iv)    staying further proceedings until the order is obeyed;

(v)     dismissing the action or proceeding in whole or in part;

(vi)    rendering a default judgment against the disobedient party; or

(vii)   treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

"If the court enters an order compelling discovery under Rule 37(a) and the order is disobeyed, the second step of the two-step process may be invoked under Rule

37(b)." *Transportes Aereos de Angola v. Ronair, Inc.*, 104 F.R.D. 482, 498 (D. Del. 1985).

This Court has seen its fair share of sanctionable conduct. The instant disagreements here do not rise to that level. For that reason, and in light of my denial of Defendant's motion to compel, the motion for sanctions is also denied. Moreover, because the underlying motion to compel was premised upon a good faith dispute as to a debatable legal question, the assessment of fees against either party is inappropriate.

## IV. CONCLUSION

In accordance with the preceding discussion, Defendant's motion to compel and motion for sanctions are both denied.

An appropriate Order commemorating this holding and setting forth a renewed case management schedule follows.

BY THE COURT:


<u>s/ Matthew W. Brann</u>
Matthew W. Brann
United States District Judge