IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WESTFIELD INSURANCE COMPANY, :
          Plaintiff,          :      Civil Action No. 4:15-539
                                :      (Judge Matthew W. Brann)
          v.                   :
                                :
ICON LEGACY CUSTOM MODULAR   :
HOMES and ICON LEGACY,       :
          Defendants.         :

**DEFENDANTS ICON LEGACY CUSTOM MODULAR HOMES AND ICON LEGACY'S RESPONSE TO PLAINTIFF WESTFIELD INSURANCE COMPANY'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

      Pursuant to Rule 56.1 of the Local Rules of this Court, Defendants Icon Legacy Custom Modular Homes and Icon Legacy ("Icon" or collectively "Defendants"), by and through counsel, hereby submit the following response to Plaintiff Westfield Insurance Company's Statement of Undisputed Material Facts:

      1.    Icon Legacy Custom Modular Homes and Icon Legacy (collectively, "Icon"), obtained an insurance policy, number TRA 5738595, which was issued by Westfield and consecutively renewed for a policy term of July 29, 2011 through July 29, 2015 (the "Policy"). See Westfield's Brief in Support of Motion for Summary Judgment ("Brief" or "Br.") Ex. N (Stip. of Adm. Facts), ¶ 1.

**RESPONSE:**  Undisputed that Icon Legacy Custom Modular Homes, LLC ("Icon") obtained the Policy as described by Westfield.  There is no separate entity known just as "Icon Legacy."  The Schedule of Named Insured for the Policy in effect from July 29, 2014 through July 29, 2015 identifies "Icon Legacy Custom Modular Homes LLC" and "Realty Acquisition LLC" as the two named insureds.  See Document 93 at Exhibit 1, p. 5, Common Policy Declarations.

## I.      The Underlying Cases

### A.    The Ahmad Case

2.      Icon, among others, was named as a defendant in an action captioned *Bilal Ahmad v. Icon Legacy Custom Modular Homes, LLC, et al.*, No. 20140499, in the Supreme Court of New York, Otsego County (the "Ahmad Case").  *See* ECF No. 28, ¶ 10; *see also* ECF No. 29, ¶ 10.

**RESPONSE:**  Undisputed.

3.      A true and correct copy of the complaint filed in the Ahmad Case is attached to Westfield's Brief as Exhibit D (the "Ahmad Complaint").

**RESPONSE:**  Undisputed.

4.      The Ahmad Complaint alleges that the plaintiff, Bilal Ahmad, contracted with Icon for the purchase, installation, and delivery of one or more modular homes. See Br. Ex. D (Ahmad Compl.), ¶¶ 12, 19.

**RESPONSE:**  Undisputed with the exception that the Ahmad Complaint does not refer to "one or more modular homes."  It refers to just one approximately 5,000 square foot custom modular home.  It is undisputed that there was more than one modular unit that was used in the construction of the modular home, but there was only one home.

5.     The Ahmad Complaint alleges a variety of defects in the construction, installation, and delivery of the home that gave rise to causes of action against Icon sounding in breach of contract, violation of the New York Uniform Commercial Code, breach of warranty, unjust enrichment, and negligence. See id., ¶¶ 21-72.

**RESPONSE:**  Undisputed that the Ahmad Complaint alleges a variety of defects resulting from the manufacturing and assembly of the home and asserts causes of action against Icon as stated.  However, it is disputed that the Ahmad Complaint alleges any specific defect regarding the delivery of the home.

6.     The Ahmad Complaint alleges that, pursuant to the contract between Icon and Ahmad, Icon's work was comprised of manufacturing the home and, separately, installing/assembling it. See id., ¶¶ 21-22.

**RESPONSE:**  Undisputed.

7.     Icon has stated that the Ahmad Complaint alleges that Icon's work included "the manufacture, delivery, set, and completion of the home[]." See Br. Ex. M (Icon's Resp. to Westfield's Interr.) at No. 12.

**RESPONSE:**  Undisputed that Icon stated that "[a]ccording to Ahmad", although it did not specifically state that "the Ahmad Complaint alleges that . . . "   Ahmad made assertions against Icon in documents other than the Ahmad Complaint, and Icon's interrogatory response was not limited to what was alleged in the Ahmad Complaint.

8.     The Ahmad Complaint alleges that Icon was the only entity that participated in the manufacture of the home. See Br. Ex. D (Ahmad Compl.), ¶¶ 13, 14, 23, 27, 69, 70.

**RESPONSE:**  Disputed.  It is undisputed that the Ahmad Complaint only identifies Icon as participating in the manufacture of the home, but the Ahmad Complaint does not ever come right out and say that no other entity participated in the manufacture of the home.

9.     Icon has acknowledged that the Ahmad Complaint does not allege that the property damage to the home was entirely the result of work performed by subcontractors of Icon and has referred to this issue as "yet to be determined." See ECF No. 29, ¶ 114.

**RESPONSE:**  Although Icon's answer to paragraph 114 of the Amended Complaint does not contain an acknowledgement as specific as alleged by Westfield, it is undisputed that the Ahmad Complaint does not contain an allegation that the property damage to the home was entirely the result of work performed by subcontractors of Icon, and that Icon did allege that "it is yet to be determined whether the alleged property damage is entirely the result of work performed by subcontractors."

10.   The Ahmad Complaint alleges that Icon "failed to fully perform its contractual obligations," causing Ahmad to incur "expenses to complete, correct, replace and/or repair Icon's work" and leaving Ahmad "with a defective and unsafe" home. Br. Ex. D (Ahmad Compl.), ¶¶ 12, 29, 32, 65.

**RESPONSE:**  Undisputed.

11.   Icon has stated that the Ahmad Complaint alleges that "the alleged work required by Icon and its purported subcontractors was never completed, and as such, it does not fall within products-completed operations hazard." Br. Ex. M (Icon's Resp. to Westfield's Interr.) at No. 9.

**RESPONSE:**  Disputed.  Westfield has taken this statement out of context.  This statement was contained as part of a larger statement in response to interrogatory 9, which provides as follows:

5

INTERROGATORY NO. 9

If You contend that the following exclusion in the Westfield Policy does not preclude coverage to You under the Westfield Policy for the claims asserted against You in the Underlying Actions, state so and explain the basis for Your contention: "'Property damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.' See CG 00 01 12 07, page 5 of 16.

ANSWER:

Objection.  This interrogatory seeks a legal conclusion.  Without waiving this objection, Icon denies that this exclusion bars coverage for the claims asserted in the Underlying Actions.  As alleged in the Underlying Actions, the alleged work required by Icon and its purported subcontractors was never completed, and as such, it does not fall within products-completed operations hazard.  Further, exclusion j.(6) expressly exempts property damage included within the products completed operations hazard.

As set forth above, Icon objected to this interrogatory, and as such, its

subsequent statement was subject to the objection that the interrogatory

involved a legal conclusion and not factual information.  Further, Icon

simply provided one alternative position regarding Exclusion (l) raised by

Westfield, similar to Westfield taking alternative positions on whether the

property damage fell within the "products completed operations hazard."

Westfield alleged in the Complaint and Amended Complaint that

"Exclusions (k) and (l) in the Policy are applicable and preclude coverage

6

for Icon." <u>See</u> Document 1, Complaint at ¶101; Document 28, Amended

Complaint at ¶ 123.  Exclusion (l) provides that:

> l.  Damage To Your Work
>
> "Property Damage" to "your work" arising out of it or any part of it and included in the "products completed operations hazard."
>
> This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

<u>See</u> Document 93 at p. 13, CGL Coverage Form.  By making the claim that

Exclusion (l) was applicable and precluded coverage, Westfield was

effectively stating that the property damage to Icon's work was included in

the "products completed operations hazard".  Icon provided alternative

reasons that Exclusion (l) might not apply.  In doing so, it expressly stated

that "exclusion j.(6) expressly exempts property damage included within the

products completed operations hazard."  As such, this statement could be

considered an acknowledgement that there was the potential for the

property damage to fall within the "products completed operations hazard"

without the claims asserted in the Underlying Actions being precluded from

coverage.

Interrogatory 9 did not deal with Endorsement CG 71 21.  Icon made

clear in its response to Interrogatory 6 that it believed there was the

potential for coverage under Endorsement CG 71 21, which provides

coverage for property damage caused by Icon's subcontractors that fall

within the "products completed operations hazard".  <u>See</u> Document 98,

Exhibit M at pp. 504 – 507.  Further, Westfield was more specific in its

Amended Complaint regarding its contention that Endorsement CG 71 21

does not apply.  It specifically alleged that:

> 119.  In addition, the allegations of the Messana Complaint and the Trevor Complaint do not fall within the "products-completed operations hazard," as is required by Endorsement CG7121, because both the Messanas and Trevor allege that their modular homes remain incomplete and unoccupied. <u>See</u> Exhibits "C" and "E."

<u>See</u> Document 28, Amended Complaint at ¶119.  Icon responded as

follows:

> 119.  Denied.  As to Trevor, she admits she is living in the house, and as such, Icon's work is deemed complete based on the Policy provision providing that Icon's work is deemed complete "When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project."  <u>Further, the work called for in Icon's contract was completed regardless of whether VMH completed all of its work.  As to the Messanas, Icon's work is deemed complete since all of the work called for in Icon's contract was completed</u>, and the only remaining work to be performed was the service, maintenance, repair or replacement of work that was otherwise complete.

<u>See</u> Document 29, Answer to Amended Complaint at ¶119 (emphasis

added).

As is clear from Westfield's allegation at paragraph 119 of the

Amended Complaint, it was not even alleging that the allegations in the

Ahmad Complaint do not fall within the "products completed operations hazard".  As to the Ahmad Complaint, Ahmad expressly alleges in paragraph 18 that:  "The Home was delivered, assembled <u>and completed</u>, in or around mid-July 2011 after which time Mr. Ahmad moved onto the premises."  <u>See</u> Document 28-2 at p. 5, Ahmad Complaint at ¶18.  Ahmad alleged later on that "Defendants failed to complete their work in a workmanlike manner, and left Mr. Ahmad with a defective and unsafe Home despite being paid substantial consideration."  <u>See</u> Document 28-2 at p. 11, Ahmad Complaint at ¶65.  Failing to complete in a workmanlike manner is different than failing to complete at all, and the definition of "products-completed operations hazard" does not require that all of the work be completed in a workmanlike manner.

Icon's objection to interrogatory 9 was not intended to be a comprehensive legal analysis of the "products-completed operations hazard", which is better left to the attorney's briefing of the law rather than the parties' response to what were supposed to be factual interrogatories.  Further, the response was provided before the Court had indicated that it was likely Pennsylvania law would apply to the coverage issue, which impacted both the coverage analysis and the applicability of the various exclusions raised by Westfield.  The ultimate legal determination as to

9

whether the alleged property damage falls within the "products-completed operations hazard" will depend on the specific language of the definition of "products-completed operations hazard", which provides in part that "'your work' will be deemed completed at the earliest of the following times: (a) When all of the work called for in your contract has been completed."  See Document 93 at p. 23, CGL Coverage Form.  Icon has been very clear in this case that it believes the claims asserted in the Underlying Actions are covered by Endorsement CG 71 21, a requirement of which is that the work be within the  "products-completed operations hazard".

12.    Icon sought defense and indemnity from Westfield for the Ahmad Case. See Br. Ex. G (Ahmad Res. of Rights Letter).

**RESPONSE:**  Undisputed that Icon sought a defense from Westfield from the claims asserted in the Ahmad Case. Disputed that Icon sought indemnity since the issue of indemnity is not even ripe.  Icon has not been found liable to Ahmad, and might never be found liable, and as such, there might never be an issue of indemnity.

13.    Westfield is currently providing Icon with a defense in the Ahmad Case under a full and complete reservation of rights. *See id.*

**RESPONSE:**  Undisputed.

## B.  The Messana Case

14.    Icon, among others, was named as a defendant in an action

captioned Anthony Messana, et al. v. Modular America Construction

Corporation, et al., No. ESCV2014-01700-A, in the Superior Court of

Massachusetts, Essex County (the "Messana Case"). See ECF No. 28, ¶

42; see also ECF No. 29, ¶ 42.

**RESPONSE:**  Undisputed.

15.    A true and correct copy of the complaint filed in the Messana

Case is attached to Westfield's Brief as Exhibit E (the "Messana

Complaint").

**RESPONSE:**  Undisputed that Exhibit E is the body of the Third

Amended Complaint (without the inclusion of Exhibits A – F), which is the

most recent complaint filed by the Messanas.

16.    The Messana Complaint alleges that Anthony and Melanie

Messana contracted with Icon for the removal, repair, and improvement of

a structure as well as the purchase and installation of a modular home and

a second structure. See Br. Ex. E (Messana Compl.), ¶¶ 9-10.

**RESPONSE:**  Undisputed.

17.    The Messana Complaint alleges a variety of defects in the

construction, installation, and delivery of the home that gave rise to causes

of action against Icon sounding in breach of contract, breach of warranty, negligence, joint and several liability, negligent infliction of emotional distress, unfair and deceptive practices, and fraud. See id., ¶¶ 30-31, 35, 39-40, 46-49, 65-71, 78-83, 88-91, 99-103, 132-34, 212-236, 272-297.

**RESPONSE:**  Undisputed that the Messanas generally allege claims as asserted by Westfield, although the Messanas do not specifically allege any defects in the delivery itself, but just the product as delivered was defective or certain actions taken after delivery were allegedly improper.

18.    The Messana Complaint alleges that, pursuant to the contract between Icon and the Messanas, Icon's work included providing, manufacturing, and installing a home. *See id.*, ¶¶ 10, 48, 66, 101.

**RESPONSE:**  Undisputed.

19.    Icon has stated that the Messana Complaint alleges that Icon's work included "the manufacture, delivery, set, and completion of the home[]." *See* Br. Ex. M (Icon's Resp. to Westfield's Interr.) at No. 12.

**RESPONSE:**  Undisputed.

20.    The Messana Complaint alleges that Icon, and Icon alone, breached its contract by "failing to properly and timely provide the subject modular home" and caused damage to it. *See* Br. Ex. E (Messana Compl.), ¶¶ 48-49.

12

**RESPONSE:**  Undisputed that the Messana Complaint alleges that Icon breached its contract with the Messanas.  Disputed that the Messana Complaint says anything about "Icon alone" performed the actions or inactions that resulted in the breach.  To the contrary, the Messana Complaint states that MACC, Gikas, Banks, McQuilkin, and/or Paquette, acted as subcontractors and/or agents of Icon.  See Document 28-4 at Exhibit C, Messana Complaint at ¶38.

21.    Icon has acknowledged that the Messana Complaint does not allege that the property damage to the home was entirely the result of work performed by subcontractors of Icon and has referred to this issue as "yet to be determined." See ECF No. 29, ¶ 114.

**RESPONSE:**  Although Icon's answer to paragraph 114 of the Amended Complaint does not contain an acknowledgement as specific as alleged by Westfield, it is undisputed that the Messana Complaint does not contain an allegation that the property damage to the homes was entirely the result of work performed by subcontractors of Icon, and that Icon did allege that "it is yet to be determined whether the alleged property damage is entirely the result of work performed by subcontractors.".

22.    The Messana Complaint alleges that Icon did not complete its work to construct and set the modular home. See Br. Ex. E (Messana Compl.), ¶¶ 28, 31, 36-37, 221, 280.

**RESPONSE:**  Undisputed.

23.    Icon has stated that the Messana Complaint alleges that "the alleged work required by Icon and its purported subcontractors was never completed, and as such, it does not fall within products-completed operations hazard." Br. Ex. M (Icon's Resp. to Westfield's Interr.) at No. 9.

**RESPONSE:**  Disputed.  Westfield has taken this statement out of context.  This statement was contained as part of a larger statement in response to interrogatory 9, which provides as follows:

INTERROGATORY NO. 9

If You contend that the following exclusion in the Westfield Policy does not preclude coverage to You under the Westfield Policy for the claims asserted against You in the Underlying Actions, state so and explain the basis for Your contention: "'Property damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.' See CG 00 01 12 07, page 5 of 16.

ANSWER:

Objection.  This interrogatory seeks a legal conclusion.  Without waiving this objection, Icon denies that this exclusion bars coverage for the claims asserted in the Underlying Actions.  As alleged in the Underlying Actions, the alleged work required by Icon and its purported subcontractors was never completed, and as such, it does not fall within products-completed operations hazard.  Further,

14

exclusion j.(6) expressly exempts property damage included within the products completed operations hazard.

As set forth above, Icon objected to this interrogatory, and as such, its subsequent statement was subject to the objection that the interrogatory involved a legal conclusion and not factual information.  Further, Icon simply provided one alternative position regarding Exclusion (l) raised by Westfield, similar to Westfield taking alternative positions on whether the property damage fell within the "products completed operations hazard." Westfield alleged in the Complaint and Amended Complaint that "Exclusions (k) and (l) in the Policy are applicable and preclude coverage for Icon."  See Document 1, Complaint at ¶101; Document 28, Amended Complaint at ¶ 123.  Exclusion (l) provides that:

l.  Damage To Your Work

"Property Damage" to "your work" arising out of it or any part of it and included in the "products completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

See Document 93 at p. 13, CGL Coverage Form.  By making the claim that Exclusion (l) was applicable and precluded coverage, Westfield was effectively stating that the property damage to Icon's work was included in the "products completed operations hazard".  Icon provided alternative

reasons that Exclusion (l) might not apply.  In doing so, it expressly stated that "exclusion j.(6) expressly exempts property damage included within the products completed operations hazard."  As such, this statement could be considered an acknowledgement that there was the potential for the property damage to fall within the "products completed operations hazard" without the claims asserted in the Underlying Actions being precluded from coverage.

Interrogatory 9 did not deal with Endorsement CG 71 21.  Icon made clear in its response to Interrogatory 6 that it believed there was the potential for coverage under Endorsement CG 71 21, which provides coverage for property damage caused by Icon's subcontractors that fall within the "products completed operations hazard".  See Document 98, Exhibit M at pp. 504 – 507.  Further, Westfield was more specific in its Amended Complaint regarding its contention that Endorsement CG 71 21 does not apply.  It specifically alleged that:

> 119.  In addition, the allegations of the Messana Complaint and the Trevor Complaint do not fall within the "products-completed operations hazard," as is required by Endorsement CG7121, because both the Messanas and Trevor allege that their modular homes remain incomplete and unoccupied. See Exhibits "C" and "E."

See Document 28, Amended Complaint at ¶119.  Icon responded as follows:

16

119.  Denied.  As to Trevor, she admits she is living in the house, and as such, Icon's work is deemed complete based on the Policy provision providing that Icon's work is deemed complete "When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project."  <u>Further, the work called for in Icon's contract was completed regardless of whether VMH completed all of its work.  As to the Messanas, Icon's work is deemed complete since all of the work called for in Icon's contract was completed</u>, and the only remaining work to be performed was the service, maintenance, repair or replacement of work that was otherwise complete.

<u>See</u> Document 29, Answer to Amended Complaint at ¶119 (emphasis added).

Icon's objection to interrogatory 9 was not intended to be a comprehensive legal analysis of the "products-completed operations hazard", which is better left to the attorney's briefing of the law rather than the parties' response to what were supposed to be factual interrogatories. Further, the response was provided before the Court had indicated that it was likely Pennsylvania law would apply to the coverage issue, which impacted both the coverage analysis and the applicability of the various exclusions raised by Westfield.  The ultimate legal determination as to whether the alleged property damage falls within the "products-completed operations hazard" will depend on the specific language of the definition of "products-completed operations hazard", which provides in part that "'your work' will be deemed completed at the earliest of the following times: (a)

When all of the work called for in your contract has been completed." <u>See</u>
Document 93 at p. 23, CGL Coverage Form.  Icon has been very clear in
this case that it believes the claims asserted in the Underlying Actions are
covered by Endorsement CG 71 21, a requirement of which is that the work
be within the  "products-completed operations hazard".

24.    Icon sought defense and indemnity from Westfield for the
Messana Case. See Br. Ex. G (Messana Res. of Rights Letter).

**RESPONSE:**  Undisputed that Icon sought a defense from Westfield
from the claims asserted in the Messana Case. Disputed that Icon sought
indemnity since the issue of indemnity is not even ripe.  Icon has not been
found liable to the Messanas, and might never be found liable, and as
such, there might never be an issue of indemnity.  Icon specifically stated in
its letter requesting a defense that:  "We have reviewed both the allegations
in the Complaint and the Policy provisions relied upon by Westfield in your
letter of August 5, 2014, and it is apparent that Westfield has a duty to
defend the claims set forth in the Complaint. **The issue of whether there**
**is a duty to indemnify can be resolved at a later point in time in the**
**event that there is a finding of liability against Icon**. We acknowledge
that Westfield is proceeding under a reservation of rights and is not
agreeing to indemnify Icon simply because it defends Icon." <u>See</u>

Document 93 at Exhibit 8, Letter from Rudd to Erickson dated November 6, 2014 (emphasis added).

25.    Westfield is currently providing Icon with a defense in the Messana Case under a full and complete reservation of rights. *See id.*

**RESPONSE:**  Undisputed.

**C.    The Trevor Case**

26.    Icon, among others, was named as a defendant in an action captioned D*agney Trevor v. Icon Legacy Custom Modular Homes, L.L.C., et al.*, No. 109611-15, in the Vermont Superior Court, Chittenden Unit (the "Trevor Case"). *See* ECF No. 28, ¶ 64; *see also* ECF No. 29, ¶ 64.

**RESPONSE:**  Undisputed.

27.    A true and correct copy of the complaint filed in the Trevor Action is attached to Westfield's Brief as Exhibit F (the "Trevor Complaint").

**RESPONSE:**  Undisputed, with the qualification that Trevor subsequently filed an amendment to Count 8 of her Amended Complaint. See Document 93 at Exhibit 13, pp. 198-99.

28.    The Trevor Complaint alleges that Dagney Trevor contracted with an alleged agent of Icon for the construction and delivery of a modular home built by Icon. *See* Br. Ex. F (Trevor Compl.), ¶¶ 8, 17, 31, 33-34.

**RESPONSE:** Undisputed, although Trevor also alleged that the contract covered the erection of the modular home.

29.    The Trevor Complaint alleges a variety of defects in the construction, installation, and delivery of the home that gave rise to causes of action against Icon sounding in fraud, breach of fiduciary duty, unjust enrichment, estoppel, breach of contract, breach of warranty, and negligence. *See id.*, ¶¶ 14, 16-18, 28, 32, 37, 48, 62, 72, 74, 77-80, 82, 89, 121-123, 128-83, 191-221, 226-87.

**RESPONSE:** Undisputed.

30.    The Trevor Complaint alleges that Icon's work included the design, construction, delivery, and completion of a home pursuant to a contract. *See id.*, ¶¶ 14, 16-18, 167-170.

**RESPONSE:** Undisputed that there are allegations that Defendants' work included the design, construction, delivery, and completion of a home, and that Icon is one of the Defendants.  However, there are also allegations that Trevor contracted with Curtis to sell and erect the modular home to Trevor.  See Document 98, Trevor Complaint at ¶138.

31.    The Trevor Complaint refers continually to the work and conduct of the "Defendants" collectively, of which Icon is part. See, *e.g., id.*, ¶¶ 133, 149, 159, 161-62, 167-70.

**RESPONSE:**  Undisputed that the Trevor Complaint collectively refers to the Defendants' work and conduct, but disputed that these references are continual.  To the contrary, there are many allegations as to the work and conduct of specific Defendants.  See Document 98 at Exhibit F, Trevor Complaint at ¶¶22-25, 27 – 47, 49 – 50, 54 – 55, 58, 59 – 61,  63 – 66, 68, 70 – 73, 76, 82, 86 – 93, 95 – 96, 121, 136 – 138, 198  200, and 204 – 208; Document 93 at Exhibit 13, Trevor Amended Complaint Count VIII, ¶¶185 – 190.

32.    The Trevor Complaint lacks any allegations of a contract between Icon and any party other than Trevor. *See generally id.*

**RESPONSE:**  Disputed.  The Trevor Complaint specifically references a contact between VMH and Icon when it states that:  "**The February 25, 2015, sales contract between VMH and the Icon Defendants** identified Plaintiff as the customer and consisted of detailed specifications for her modular home that Plaintiff had discussed with Defendant Curtis."  See Document 98 at Exhibit F, Trevor Complaint at ¶ 192 (emphasis added).   The Trevor Complaint specifically mentions a contact between Curtis, VMH and Icon when it states that:  "In addition, Curtis, VMH and the Icon defendants failed to disclose **their own purported contracts with each other**, which contain material information

the nondisclosure of which caused the representations made to Plaintiff by Icon, Curtis and VMH to be materially misleading." Id. at ¶ 202 (emphasis added).  The Trevor Complaint alleges that Icon markets, sells and transports the principal component parts of modular homes directly and through agents such as VMH.  See Document 98 at Exhibit F, Trevor Complaint at ¶ 6.  The Trevor Complaint further alleges that:  "At all times, described in this Complaint, Curtis and Bouvier were acting as agents of VMH and the Icon Defendants, and VMH was acting as an agent of the Icon Defendants" and that:  "At all times, Curtis was acting for himself as well as on behalf of the other Defendants as their agent, and on behalf of VMH as an agent of the Icon Defendants.  Id. at ¶¶ 8 & 139.  The Trevor Complaint further alleges that Osborne was acting as the agent of Icon.  Id. at ¶ 211.  The allegations of agency imply some form of contractual relationship between Icon as the principal and Curtis, VMH and Osborne as the agent.

33.    Icon has acknowledged that the Trevor Complaint does not allege that the property damage to the home was entirely the result of work performed by subcontractors of Icon and has referred to this issue as "yet to be determined." See ECF No. 29, ¶ 114.

**RESPONSE:**  Although Icon's answer to paragraph 114 of the Amended Complaint does not contain an acknowledgement as specific as alleged by Westfield, it is undisputed that the Trevor Complaint does not contain an allegation that the property damage to the home was entirely the result of work performed by subcontractors of Icon, and that Icon did allege that "it is yet to be determined whether the alleged property damage is entirely the result of work performed by subcontractors.".

34.    The Trevor Complaint contains numerous allegations that the home remains uncompleted and seeks compensatory damages from when the home was supposed to be completed until the work on the home is completed and functioning as intended. See Br. Ex. F (Trevor Compl.), ¶¶ 17-18, 51, 96, 99-100, 110, 113, 117-18, 122-23, 145(d), 152(d), 164(d), 170(d), 181(d), 196(d), 207(d), 208(d), 218(d), 230(d), 244(d), 257(d), 264(d), 272(d), 278(d), 286(d).

**RESPONSE:**  Disputed.  The Trevor Complaint makes very clear that the home is completed when it refers to Trevor's alleged damages to complete the contract to construct the home, and specifically claims damages as follows:  "Total Payments to Contractors to complete the contract - $36,143.15".  <u>See</u> Document 98 at Exhibit F, Trevor Complaint at ¶ 143.  There is a distinction between completing a home and completing it

23

as intended.  A home that is painted the wrong color might not be completed as intended, but would be considered complete for purposes of the ability to occupy the home.  In this situation, Trevor has simply alleged that the home is not completed as intended.  Id. at ¶145.d.   The majority of allegations referred to by Westfield deal with statements made prior to the completion of the home.

35.    Icon sought defense and indemnity from Westfield for the Trevor Case.  *See* Br. Ex. I (Trevor Declination Letter).

**RESPONSE:**  Undisputed that Icon sought a defense from Westfield from the claims asserted in the Trevor Case. Disputed that Icon sought indemnity since the issue of indemnity is not even ripe.  Icon has not been found liable to Trevor, and might never be found liable, and as such, there might never be an issue of indemnity.

36.    Westfield denied coverage under certain terms, conditions, limitations, exclusions, and/or endorsements of the Policy by way of a detailed declination letter. *See id.*

**RESPONSE:**  Undisputed.

## II.    The Insurance Policy

37.    Icon obtained and renewed the Policy from Pennsylvania. See Br. Ex. N (Stip. of Adm. Facts), ¶ 1.

**RESPONSE:**  Undisputed.

38.    Icon is a Pennsylvania limited liability company with its

headquarters (and only office) located in Selinsgrove, Pennsylvania. See

Br. Ex. K (Hicks Tr.), 18:1-11, 19:8-9, 26:22-27:2, 27:13-20, 29:2-14, 33:10-

13; Br. Ex. L (Icon's Res. to Westfield's RFA), at No. 3; Br. Ex. M (Icon's

Res. to Westfield's Interr.), at No. 20.

**RESPONSE:**  Undisputed.

39.    All of Icon's business operations are located in its Selinsgrove,

Pennsylvania office. See Br. Ex. K (Hicks Tr.), 18:1-11, 19:8-9, 26:22-27:2,

27:13-20, 29:2-14, 33:10-13; Br. Ex. L (Icon's Resp. to Westfield's RFA), at

No. 3; Br. Ex. M (Icon's Resp. to Westfield's Interr.), at No. 20.

**RESPONSE:**  Undisputed.

40.    All of Icon's communications related to the negotiation,

issuance, and renewal of the Policy were made from, and made to, a

location in Pennsylvania. See Br. Ex. N (Stip. of Adm. Facts), ¶¶ 5-14, 17-

19, 21; Br. Ex. K (Hicks Tr.), 7:26, 8:14-9:1, 34:19-23, 36:19-22, 39:3-12,

41:10-42:1; Br. Ex. O (Snyder Aff.), ¶¶ 1-9, 12.

**RESPONSE:**  Undisputed.

41.    All documents Icon signed, completed, and sent related to the

Policy were signed, completed, and sent from Pennsylvania. See Br. Ex. N

(Stip. of Adm. Facts), ¶¶ 2-4, 11-13; Br. Ex. K (Hicks Tr.), 35:16-21, 36:3-5;

Br. Ex. O (Snyder Aff.), ¶ 11.

**RESPONSE:** Undisputed.

42.    The Policy was underwritten by Westfield in its Lancaster,

Pennsylvania office. *See* Br. Ex. P (Schmehl 30(b)(6) Tr.), 17:21-25, 45:18-

23, 74:7-23.

**RESPONSE:** Disputed.  Westfield refused to produce anyone from

the underwriting department to testify as to the underwriting of the Policy,

and Mr. Schmehl had no first hand knowledge as to the underwriting of the

Policy and was just making assumptions as to the underwriting of the

Policy.

43.    The Policy was delivered to Icon's insurance agent located in

Lancaster, Pennsylvania. *See id.*, 65:17-25; Br. Ex. N (Stip. of Adm. Facts),

¶¶ 15-16; Br. Ex. L (Icon's Resp. to Westfield's RFA), at Nos. 4-5; Br. Ex. K

(Hicks Tr.), 47:20-22; Br. Ex. O (Snyder Aff.), ¶¶ 7, 10.

**RESPONSE:** Undisputed.

44.    The Policy was hand-delivered by Icon's insurance agent to

Icon in Selinsgrove, Pennsylvania. *See* Br. Ex. P (Schmehl 30(b)(6) Tr.),

65:17-25; Br. Ex. N (Stip. of Adm. Facts), ¶¶ 15-16, 20; Br. Ex. L (Icon's

Res. to Westfield's RFA), at Nos. 4-5; Br. Ex. K (Hicks Tr.), 47:20-22; Br.

Ex. O (Snyder Aff.), ¶¶ 7, 10.

**RESPONSE:**  Undisputed.

45.    All invoices for premium payments for the Policy were sent to

Icon in Selinsgrove, Pennsylvania. *See* Br. Ex. K (Hicks Tr.), 49:14-50:23,

51:16-18.

**RESPONSE:**  Undisputed.

46.    All premium payments for the Policy were mailed by Icon from

Selinsgrove, Pennsylvania. *See* Br. Ex. K (Hicks Tr.), 49:14-50:23, 51:16-

18.

**RESPONSE:**  Undisputed.

47.    The Policy included commercial general liability coverage under

policy form CG0001 (12/07). *See* Br. Ex. B; ECF No. 28, ¶ 81; *see also*

ECF No. 29, ¶ 81.

**RESPONSE:**  Undisputed that the Policy included commercial

general liability coverage under policy form CG0001.  However, at some

point the version of the form changed from (12/07) to (4/13), since the

Policy in force from July 29, 2014 – July 29, 2015 used the (4/13) version.

See Document 93 at Exhibit 1.  Icon does not believe that there are any

27

material differences between these two version for the issues involved in this case.

48.    A true and correct copy of the policy form CG0001 (12/07) is attached to Westfield's Brief as Exhibit B.

**RESPONSE:**  Undisputed as to the (12/07) version.  The (4/03) version is attached as part of Document 93 at Exhibit 1.

49.    The Policy's Commercial General Liability Insuring Agreement form for coverage A states:

a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

b.    This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

Br. Ex. B, Page 1; see also ECF No. 28, ¶ 82; ECF No. 29, ¶ 82.

**RESPONSE:**  Undisputed.

50.   The Policy contains the following exclusion:

b.   Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an

insured are deemed to be damages because of "bodily injury" or "property damage", provided:

> (a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

> (b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

Br. Ex. B, Page 2; *see also* ECF No. 28, ¶ 88; ECF No. 29, ¶ 88.

**RESPONSE:**  Undisputed.

51.   The Policy includes the following definition:

> 13.   "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

*Id.*, Page 15; *see also* ECF No. 28, ¶ 84; ECF No. 29, ¶ 84.

**RESPONSE:**  Undisputed.

52.   The Policy includes the following definition:

> 16.   "Products-completed operations hazard":

> (a)   Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

> > (1) Products that are still in your physical possession; or

> > (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as complete.

(b) Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products – completed operations are subject to the General Aggregate Limit.

Br. Ex. B, Page 15.

**RESPONSE:**  Undisputed.

31

53.   The Policy includes the following definition:

17.   "Property damage" means:

a.   Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.   Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

*Id.*; *see also* ECF No. 28, ¶ 86; ECF No. 29, ¶ 86.

**RESPONSE:**  Undisputed.

54.   The Policy includes the following definition:

22.   "Your work":

a.   Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

b.   Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work;" and

(2) Materials, parts or equipment furnished in connection with such work or operations.

Br. Ex. B, Page 16.

**RESPONSE:**  Undisputed.

55.    The Policy does not define the term "subcontractor." *See* Br.

Ex. B.

**RESPONSE:**  Undisputed.

56.    Endorsement CG7121 (10/09) was added to the Policy

("CG7121").  *See* Br. Ex. C; ECF No. 28, ¶ 87; ECF No. 29, ¶ 87.

**RESPONSE:**  Undisputed.

57.    A true and correct copy of CG7121 is attached to Westfield's

Brief as Exhibit C.

**RESPONSE:**  Undisputed.

58.    The Endorsement states:

> f.    Damages because of "property damage" include
> damages the insured becomes legally obligated to pay because
> of "property damage" to "your work" and shall be deemed to be
> caused by an "occurrence", but only if:
>
>> (1) The "property damage" is entirely the result of work
>> performed on your behalf by a subcontractor(s) that is not
>> a Named Insured;
>>
>> (2) The work performed by the subcontractor(s) is within
>> the "products-completed operations hazard"; and
>>
>> (3) The "property damage" is unexpected and unintended
>> from the standpoint of the insured.

*See* Br. Ex. C.

**RESPONSE:**  Undisputed that this language is contained in the

Endorsement, although the above quoted language fails to

include the opening sentence that states:

1.   The following is added to **SECTION 1 – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, paragraph **1. Insuring Agreement**:

 

McNEES WALLACE & NURICK LLC

By   /s/ Jonathan H. Rudd
    Jonathan H. Rudd
    Attorney I.D. No. 56880
    100 Pine Street
    P.O. Box 1166
    Harrisburg, PA  17108-1166
    (717) 237-5405 (phone)
    (717) 260-1737 (fax)
    jrudd@mcneeslaw.com

Dated:  July 31, 2017        Counsel for Defendants Icon Legacy Custom Modular Homes and Icon Legacy, and Icon Legacy Custom Modular Homes, LLC

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served upon the following by the Court's ECF system:

John J. Haggerty, Esquire
James C. Clark, Esquire
Zachary Martin, Esquire
Fox Rothschild LLP
2700 Kelly Road, Suite 300
Warrington, PA 18976

Date:  July 31, 2017

By /s/ Jonathan H. Rudd
Jonathan H. Rudd